## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DONALD F. FATUTE

         Plaintiff,

     v.                                      Case No. C-1-06-184

SUMCO USA,

         Defendant.

## <u>ORDER</u>

### I. Introduction

      This matter is before the Court upon defendant SUMCO USA's motion for summary judgment (doc. 24), plaintiff's response (doc. 26), and defendant's reply (doc. 28). Defendant has filed proposed findings of fact and conclusions of law, which plaintiff has highlighted as true, false, or irrelevant (doc. 27). The matter is also before the Court upon plaintiff's motion for leave to file a sur-reply or, in the alternative, to strike the affidavit of Debra Wilson (doc. 29), defendant's opposing memorandum (doc. 30) and plaintiff's reply (doc. 32). Plaintiff brings this action against SUMCO USA, his former employer, claiming sexual harassment and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and Ohio Rev. Code §§ 4112.02 and 4112.99. Defendant moves for summary judgment on all claims.

1

## II.  Facts

The following facts are undisputed:

1.      SUMCO USA (SUMCO) is in the business of manufacturing electronic-grade silicon

        wafers.

2.      Plaintiff was employed at SUMCO's Maineville, Ohio, plant.  The plant has one area -

        the polishing department - devoted exclusively to polishing the wafers.  The polishing

        department consists of three rooms referred to as MP1, MP2 and MP3, each of which

        contains different machines used in the polishing process, including machines known as

        Enyas, ADE's and the Clean Line.

3.      There are approximately 40 to 45 production operators per shift, each of whom is

        assigned to a particular room and machine based on the operator's expertise.

4.      Typically, operators have a regular room assignment.  Operators may be assigned to

        different rooms and/or machines on a given shift, however, depending on production and

        staffing needs.

5.      A Production Supervisor supervises all of the employees in rooms MP1, MP2 and MP3.

        In addition, a Lead Production Operator ("Lead") is assigned to each of the three rooms.

        The Leads, while not supervisors, provide guidance as needed to the other operators, who

        may have less knowledge and/or experience, in order to keep production moving.

6.      Plaintiff was hired by defendant effective March 22, 2004, to work the midnight to noon

        shift.

7.   As part of plaintiff's orientation, he received training on SUMCO's policies, including its

sexual harassment policy.  He also received a copy of SUMCO's Employee Handbook,

which contained a section on harassment prevention, and a copy of SUMCO's

Discrimination and Harassment Prevention policy.

8.   The Employee Handbook provided, in part, as follows:

> Employees who have a complaint or concern about possible sexual
> harassment in connection with incidents they have experienced or
> of which they are aware are required to report such complaint or
> concern immediately . . . You are required to report timely
> concerns to your supervisor or the Director of Human Resources.
> Reports will be investigated and, where appropriate, prompt
> corrective action will be taken . . .
>
> If you feel that you cannot talk to your supervisor or have made an
> attempt to do so and feel that the situation has not been resolved,
> you should pursue the matter further with the Human Resources
> Director.

9.   The Discrimination and Harassment Prevention policy provided, in part, as follows:

> Employees who feel they have been subjected to discrimination or
> harassment should . . . bring the matter to the attention of their
> supervisor/manager or a Human Resources Representative.

10.  Shortly after being hired, plaintiff was assigned to MP2.  He reported to Vina Jones, the

Production Supervisor on the overnight shift.

11.  Sue Peck, who also reported to Jones, was the Lead assigned to MP2.

12.  MP2 contained two rooms separated by sliding glass doors.  As part of her Lead duties,

Peck spent time in both rooms to make sure operations were running smoothly.  The

parties dispute how much of a 12-hour shift Peck spent in the same room with plaintiff.

3

13.　　On November 16, 2004, there was an incident in the cafeteria while plaintiff was on break with some co-workers.  The circumstances surrounding the incident are disputed.  What is undisputed is that Peck came into the room and, in the course of some conversation with the group, slapped plaintiff a few times in the back of the head.

14.　　Plaintiff reported the incident to the polishing department Production Manager, Mark Bresser, and to Deborah Wilson, a Human Resources Department representative.  Plaintiff also reported for the first time that Peck had been sexually harassing him.

15.　　Following the cafeteria incident, defendant assigned plaintiff to another room, MP1.

16.　　At some point in time on which the parties disagree, and for reasons that the parties dispute, plaintiff was reassigned to MP3, where Janet Spraudlin was the Lead.  Peck had also been reassigned to that room.

17.　　On May 29, 2005, plaintiff walked out during his shift.  He told Jones and Andy Saylor, the Production Supervisor in another department, that he was quitting.  According to Jones, plaintiff was angry, and he complained to both Saylor and Jones about Peck putting her hands on him.  Saylor and Jones unsuccessfully tried to persuade plaintiff not to leave.  Plaintiff resigned his job effective June 15, 2005.

### III.  Motion to strike affidavit or file sur-reply

Plaintiff moves to strike the affidavit of Deborah Wilson, which is attached to defendant's reply and concerns the investigation defendant allegedly undertook in response to plaintiff's November 2004 harassment complaint, on the ground that it presents new evidence to which plaintiff has not had an opportunity to reply.  In the alternative, plaintiff seeks leave to file a sur-reply in order to have an opportunity to address the affidavit.  As discussed below, it is apparent from the record before the Court, independent of Wilson's affidavit, that there are

4

genuine issues of material fact which preclude a grant of summary judgment in this case. Accordingly, the Court will deny plaintiff's motion.

### IV.  Summary judgment motion

**A.  Summary judgment standard**

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action.  This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).  The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *Id.* (citing *Cities Serv.*,  391 U.S. at 288-289).  The Court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as matter of law." *Id.* at 251-52.  If the evidence is merely colorable, *Id.* (citing *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967), or is not significantly probative, *Id.* (citing *Cities Serv.*, 391 U.S. at 290), judgment may be granted.

5

**B. Sexual harassment claims**

Discrimination claims under Ohio Rev. Code § 4112 are generally governed by the same standards as discrimination claims under Title VII. *Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607, 609-10, 575 N.E.2d 1164 (1991); *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 561 (6th Cir.2004). The Court will therefore analyze plaintiff's claims under federal law standards.

In order for sexual harassment to be actionable, it must be "sufficiently 'severe or pervasive' to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). To establish a prima facie hostile environment case based on gender under Title VII, plaintiff must establish that (1) he is a member of a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was based on his gender, (4) the harassment had the effect of unreasonably interfering with his work performance by creating a hostile, offensive, or intimidating work environment, and (5) there is employer liability. *Clark v. UPS, Inc.*, 400 F.3d 341, 347 (6th Cir. 2005); *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

To satisfy the fourth prong, plaintiff must show that the conduct to which he was subjected was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and that he subjectively regarded the conduct as abusive. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658-59 (6th Cir. 1999)). In determining whether a reasonable person would consider an environment hostile or abusive, a court must consider all of the circumstances, including the frequency and severity of the conduct and whether the conduct is threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's

6

work performance. *Hafford,* 183 F.3d at 512.

Employer liability for co-worker harassment is based directly on the employer's conduct.

*Hafford,* 183 F.3d at 513 (citing *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 804 n. 11

(6th Cir. 1994)). An employer is liable if it "knew or should have known of the charged sexual

harassment and failed to implement prompt and appropriate corrective action." *Id.* If the

employer has fashioned a response to a complaint of co-worker harassment, the employer will be

liable only "if its response manifests indifference or unreasonableness in light of the facts the

employer knew or should have known." *McCombs v. Meijer, Inc*., 395 F.3d 346, 353 (6th Cir.

2005) (citing *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997)).[1] In

such a case, the employer's discriminatory act is not the harassment but is "the inappropriate

response to the charges of harassment." *Id*.

Defendant contends that this case involves alleged harassment by a co-worker because

Peck did not have the authority to affect the terms or conditions of plaintiff's employment or

those of any other operator. Defendant argues that plaintiff cannot establish the elements of a

co-worker sexual harassment claim. Defendant alleges that plaintiff cannot meet the fourth

_____

[1]The continued viability of *Blankenship* has been called into question insofar as
*Blankenship* held that "mere negligence as to the content of the response cannot be enough to
make the employer liable. When an employer responds with good faith remedial action . . . it can
be liable for sex discrimination in violation of Title VII only if that remedy exhibits such
indifference as to indicate an attitude of permissiveness that amounts to discrimination." *See
Collette v. Stein-Mart, Inc*., 126 Fed.Appx. 678, 684 (6th Cir. 2005) (not published in Fed.
Reporter). The Sixth Circuit in *Collette* stated that an employer may be held liable when its
remedial response is "merely negligent, however well-intentioned." *Id*. at 684, n. 3. The Court
need not resolve the issue at this juncture since, as explained below, there are questions of fact as
to whether there is employer liability under either a negligence standard or the *Blankenship*
standard.

element of a case of co-worker harassment, i.e., that he was subjected to a hostile environment consisting of severe or pervasive harassment based on his gender that altered the terms or conditions of his employment.  Defendant contends that Peck's acts of putting her hand on his shoulder, putting her arm around him, brushing up against him, and slapping and grabbing his buttocks were not based on sex as plaintiff does not claim that Peck ever made a specific sexual comment to him.  In addition, defendant claims that once plaintiff was assigned to MP1 following his claim of harassment in November of 2004, his contact with Peck was infrequent. Moreover, defendant claims that Peck's alleged conduct did not interfere with plaintiff's performance of his job duties because, according to plaintiff, he always did a good job for SUMCO.  Finally, defendant contends that its response to plaintiff's complaint of harassment in November 2004 was satisfactory.

Plaintiff does not dispute that this case is properly analyzed as a case of co-worker harassment.  Plaintiff alleges that the facts, when construed in his favor, establish that Peck's conduct was of a sexual nature and was both severe and pervasive.  Plaintiff disputes defendant's claim that it took prompt and remedial action to remedy the harassment.  Plaintiff claims that although he was initially moved into a different room following the cafeteria incident, Peck continued to have contact with him and he was eventually moved into the room where Peck was the co-lead, MP3, two to three months before his resignation.

Plaintiff has come forward with sufficient evidence to create a genuine issue of material fact as to whether he was subjected to sexual harassment by Peck that was severe or pervasive and that unreasonably interfered with the performance of his job duties.  Defendant's argument that the alleged harassment by Peck was not sex-based  because it was not accompanied by comments of a sexual nature is not well-taken.  A reasonable jury could certainly conclude that

8

unwanted physical touching, including groping of the buttocks, of a member of the opposite sex is sexual in nature. Defendant's argument that the conduct necessarily did not interfere with the performance of plaintiff's job because plaintiff contends that he always believed that he had done a good job for defendant is likewise not well-taken. It is not necessary that an individual's actual job performance or productivity suffer in order for the victim of harassment to have an actionable hostile environment claim.

In addition, a reasonable jury could conclude that the harassment was severe or pervasive. Defendant's reliance on several Sixth Circuit and Ohio cases that allegedly involved much more egregious conduct than that alleged here for the proposition that Peck's conduct as testified to by plaintiff was not sufficiently severe or pervasive to constitute actionable sexual harassment is misplaced. First, defendant cites ***Bowers v. Hamilton City School Dist. Bd. of Educ.,*** 2002 WL 449499 (Ohio App. 12 Dist.) (unpublished decision) and parenthetically notes that the appellate court affirmed summary judgment where the harasser's conduct included "touching plaintiff's shoulder, hugging her, kissing her on the cheek, grabbing her face to attempt to kiss her, asking her to breakfast, repeatedly telling her she looked pretty, that she has kissable lips, and that her husband was a lucky man."). Defendant fails to mention, however, that the appellate court did not rule on whether this conduct was severe or pervasive. Rather, the court determined that the defendant had taken corrective action that had resulted in the cessation of the offensive conduct and that this particular factor was determinative of plaintiff's case.

Defendant also cites ***Mast v. IMCO Recycling of Ohio, Inc.,*** 58 Fed. Appx. 116, 121 (6th Cir. 2003) (not published in Fed. Reporter) and ***Bowman v. Shawnee State University,*** 220 F.3d 456, 463 (6th Cir. 2003), two cases where the Sixth Circuit found that much of the conduct complained of, which included mistreatment, aggressive conduct that was motivated by anger,

and actions that did not involve physical contact, was not sexual in nature. Those cases are of little relevance here since a reasonable jury could determine that Peck's alleged physical contact with plaintiff was sexual in nature.

In addition, defendant relies on a district court case from Texas in support of its position that its response to plaintiff's complaint of harassment was satisfactory. ***See Harvill v. Westward Communications, L.L.C.,*** 311 F.Supp.2d 573 (E.D. Tex. 2004). Defendant notes that in addition to finding that the plaintiff unreasonably failed to take advantage of the company's corrective opportunities, the district court found that the alleged conduct "fail[ed] to constitute an objectively severe and pervasive hostile work environment." Aside from not being bound by the decision of a district court in Texas, this Court finds the district court decision in ***Harvill*** is not persuasive for two reasons. First, as the Fifth Circuit noted on appeal of that decision, the district court improperly imposed a heightened burden on the plaintiff by requiring her to prove that the conduct complained of was "severe and pervasive" rather than "severe or pervasive." 433 F.3d 428, 434-435 (5th Cir. 2005). Second, the Fifth Circuit rejected the district court's determination that the conduct in that case could not constitute severe or pervasive conduct. The appellate

court determined that:

> Undoubtedly, the deliberate and unwanted touching of Harvill's intimate body parts can constitute severe sexual harassment . . . Viewing the evidence in the light most favorable to Harvill, the non-movant, we conclude that a reasonable jury could find that Rogers' conduct was sufficiently severe or pervasive to alter a term or condition of Harvill's employment. . . .

*Id*. at 436.

Similarly, viewing the evidence in this case in the light most favorable to plaintiff, a reasonable jury could conclude that Peck's frequent touching, massaging, and grabbing of plaintiff was sufficiently severe or pervasive to create a hostile environment and alter the conditions of plaintiff's employment. Defendant is not entitled to summary judgment on the ground that plaintiff cannot establish the fourth prong of a hostile environment case.

Finally, there are questions of fact as to whether defendant "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." Defendant took prompt action upon being advised of plaintiff's initial complaint, although it is unclear whether defendant actually investigated the sexual harassment complaint plaintiff made and whether its decision to separate Peck from plaintiff was in response to that complaint or was solely in response to the cafeteria incident. In any event, plaintiff claims that he was required to work in the same room as Peck at times after his complaint and that at some point after he had made the complaint, he and Peck were placed in MP3 together. Plaintiff claims that the harassment continued and he complained several times to Jones, who told him she would see what she could do, but that defendant did nothing to remedy the situation. A reasonable jury could therefore conclude that defendant knew that plaintiff was being subjected to continuing harassing behavior by Peck but that it failed to take prompt action to remedy the situation. Defendant is therefore not entitled to summary judgment on the ground that plaintiff

11

cannot establish the fifth element of a hostile environment case.

To conclude, there are numerous issues of disputed fact underlying resolution of plaintiff's sexual harassment claim. It is for a jury to determine the credibility of the witnesses, weigh the evidence, resolve the disputed factual issues, and decide whether plaintiff is entitled to judgment on his sexual harassment claim. Defendant's motion for summary judgment as a matter of law on this claim is denied.

## C. Constructive discharge claim

An individual who claims a constructive discharge based on a hostile environment must show "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Penn. State Police v. Sanders,* 542 U.S. 129, 147 (2004). For a constructive discharge to occur, "the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *See Moore v. Kuka Welding Systems,* 171 F.3d 1073, 1080 (6th Cir. 1999). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (citing *Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir.1982)). "Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions." *Id.*

Defendant contends that plaintiff cannot establish that he was constructively discharged because he knew from company policy and prior experience that defendant took complaints of sexual harassment seriously and would take immediate corrective action upon receiving a complaint. Defendant states that it is clear it did not intend the work environment to cause plaintiff to resign given that when he complained in November of 2004, defendant immediately placed him in a different working environment, suspended Peck, and threatened her with

12

termination.  Defendant also notes that Saylor and Jones both tried to talk plaintiff out of quitting when he walked off of the job his last day.  Defendant therefore claims that a reasonable person in plaintiff's shoes would not have felt compelled to resign.  Defendant further contends that plaintiff's failure to provide the company an opportunity to correct the alleged harassment before he quit dooms his constructive discharge claim.

Whether plaintiff was constructively discharged from his employment is a determination for the jury to make under the facts of this case.  The issues of fact underlying resolution of this claim preclude a grant of summary judgment in favor of defendant.

## V. Conclusion

In accordance with the foregoing, plaintiff's motion for leave to file a sur-reply or, in the alternative, to strike affidavit (doc. 29) is **DENIED**.  Defendant's motion for summary judgment (doc. 24) is **DENIED**.  This case will proceed to trial in accordance with the schedule established by the Court.

**IT IS SO ORDERED.**

S/ Herman J. Weber
HERMAN J. WEBER, SENIOR JUDGE
UNITED STATES DISTRICT COURT